UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN BEARD,

    Plaintiff,                                  Hon. Janet T. Neff

v.                                           Case No. 1:09-CV-283

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

# **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was 38 years of age at the time of the ALJ's decision. (Tr. 20, 54). He successfully completed high school and worked previously as a firefighter, machine operator, and machine repairer. (Tr. 120-24).

Plaintiff applied for benefits on September 1, 2005, alleging that he had been disabled since September 15, 2001, due to a learning disability, nerve problems, and an injury to his right hand. (Tr. 11, 104). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 26-54). On July 16, 2008, Plaintiff appeared before ALJ Patricia Hartman, with testimony being offered by Plaintiff and vocational expert, Sue Lyon. (Tr. 412-58). In a written decision dated August 7, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 11-20). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 3-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

In March 1989, Plaintiff participated in various tests, the results of which revealed he possessed a verbal IQ of 80, a performance IQ of 87, and a full scale IQ of 82. (Tr. 167-69). These scores correlated to "the Below Average range for his age group." (Tr. 168).

On August 28, 2001, Plaintiff was examined by Dr. John Woodworth. (Tr. 211-12). Plaintiff reported experiencing pain and numbness in his right (dominant) upper extremity. (Tr. 198, 211). Plaintiff was diagnosed with flexor tendinitis and Raynaud's phenomenon.[1] (Tr. 211). On September 25, 2001, Plaintiff was examined by Dr. K. Thomas Crocker, who diagnosed Plaintiff with lateral epicondylitis of the right elbow. (Tr. 218).

On December 10, 2001, Plaintiff was examined by Richard King, Ed.D. (Tr. 318-23). Plaintiff participated in testing, the results of which revealed that he possessed a verbal IQ of 76, a performance IQ of 77, and a full-scale IQ of 75. (Tr. 320). Plaintiff was diagnosed with borderline intellectual functioning. (Tr. 323). The doctor concluded that Plaintiff "will function best in work assignments which are not too demanding from a judgment and decision making standpoint." (Tr. 323). Dr. King further observed, however, that Plaintiff "does appear to have the ability to undertake job settings which require some training." (Tr. 323). Thus, the doctor concluded that "[s]ome semi-technical or semi-skilled occupations would be a possibility for [Plaintiff]." (Tr. 323).

On November 2, 2004, Matthew Rushlau, Ed.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 368-81). Determining that Plaintiff

---

[1] Raynaud's phenomenon occurs when the blood vessels that feed the fingers and toes constrict in reaction to cold or emotional stress. Diverting blood flow away from the extremities to keep the body's core warm is a normal reaction to extreme cold. However, in Raynaud's phenomenon, the body reduces blood flow to the fingers and toes under relatively minor cold stress, such as holding a glass of ice water or being in an air-conditioned room. The same reaction can be triggered by emotional strain or excitement. *See* Raynaud's Phenomenon, available at http://www.arthritis.org/disease-center.php?disease_id=22 (last visited on July 12, 2010).

possessed borderline intelligence, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.02 (Organic Mental Disorders) of the Listing of Impairments. (Tr. 369-77). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 378). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had never experienced an episode of decompensation. (Tr. 378).

Dr. Rushlau also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 364-67). Plaintiff's abilities were characterized as "moderately limited" in one category. (Tr. 364-65). With respect to the remaining 19 categories, the doctor reported that Plaintiff either was "not significantly limited" or that there existed "no evidence of limitation in this category." (Tr. 364-65).

On June 20, 2005, Plaintiff participated in a nerve conduction study, the results of which were "abnormal" with "electrodiagnostic evidence of moderate severity CTS [carpal tunnel syndrome] on the right." (Tr. 312-13). On July 6, 2005, Plaintiff was examined by Dr. James Horton, Jr. (Tr. 308). An examination of Plaintiff's right hand and wrist revealed "decreased sensation in the median nerve distribution." (Tr. 308). Phalen's test[2] and Tinel's sign[3] were both

---

[2] Phalen's test is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on July 12, 2010). Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together. The patient should hold this position for one minute. A positive test is indicated by numbness or tingling along the median nerve distribution. *Id.*

[3] Tinel's test (or Tinel's sign) is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on July 12, 2010). Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up. A positive test causes tingling or paresthesia,

positive. (Tr. 308). The doctor recommended that Plaintiff undergo surgery. (Tr. 308). On July 22, 2005, Plaintiff underwent right carpal tunnel surgery performed by Dr. Horton. (Tr. 307).

On September 28, 2005, Plaintiff was examined by Dr. Donald Condit. (Tr. 334-35). An examination of Plaintiff's right hand revealed positive Tinel's sign. (Tr. 334). Plaintiff reported experiencing numbness on the adjacent sides of his middle and ring fingers. (Tr. 334). Plaintiff exhibited "restricted" range of finger motion. (Tr. 334). Dr. Condit concluded that Plaintiff suffered an "intraoperative median nerve injury involving the common digital nerve to the adjacent sides of the middle and ring" fingers. (Tr. 335). The doctor reported that Plaintiff was "capable of some light activities, but high force, high impact activities would be unrealistic." (Tr. 335).

Treatment notes dated October 5, 2005, indicate that Plaintiff was experiencing difficulty using his right hand. (Tr. 270). Plaintiff reported that he was able to perform certain limited household activities, but that "it takes him longer" and his hand "is painful and will start to swell." (Tr. 270). Plaintiff reported that he can only lift two pounds with his right hand. (Tr. 270).

On October 21, 2005, Plaintiff was examined by Dr. Horton. (Tr. 302). Plaintiff reported that his hand felt "uncomfortable." (Tr. 302). Plaintiff exhibited "excellent" range of motion, but "decreased" sensation along the ulnar aspect of his middle finger and the radial aspect of his ring finger. (Tr. 302). The doctor also noted that Plaintiff's hand were "cool" to the touch. (Tr. 302).

On December 7, 2005, Dr. W. E. Van Houten completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 275-88). Determining that Plaintiff possessed borderline intelligence, the doctor concluded that Plaintiff satisfied the Part A criteria for

---

and sometimes even a "shock type sensation," in the median nerve distribution. *Id.*

Section 12.02 (Organic Mental Disorders) of the Listing of Impairments. (Tr. 276-84). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 285). Specifically, the doctor concluded that Plaintiff experienced mild to moderate restrictions in the activities of daily living (due to his "hand problem"), mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and had never experienced an episode of decompensation. (Tr. 285).

Dr. Van Houten also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 289-92). Plaintiff's abilities were characterized as "moderately limited" in two categories. (Tr. 289-90). With respect to the remaining 18 categories, the doctor reported that Plaintiff either was "not significantly limited" or that there existed "no evidence of limitation in this category." (Tr. 289-90).

On February 25, 2006, Plaintiff participated in an independent medical examination conducted by Dr. Paul Drouillard. (Tr. 204-08). Plaintiff reported that he was experiencing pain in right thumb, as well as pain and numbness in the middle and ring fingers of his right hand. (Tr. 205). Plaintiff described his pain as "frequent, cramping and moderate in intensity." (Tr. 205). Plaintiff exhibited "decreased flexion of the right middle and ring finger." (Tr. 206). The doctor observed that Plaintiff's right hand was "cool, shiny and sweaty" and "has some mottling of the skin." (Tr. 206). Plaintiff also exhibited "decreased sensation of the right middle and ring fingers." (Tr. 206). Dr. Drouillard concluded that Plaintiff was suffering from early complex regional pain

7

syndrome[4] of the right hand. (Tr. 207). The doctor reported that Plaintiff was only able to work "in a one-handed capacity." (Tr. 207).

On April 6, 2006, Plaintiff participated in an independent medical examination conducted by Dr. Mark DeHaan. (Tr. 198-201). Plaintiff reported experiencing pain in his right hand and wrist. (Tr. 198). Plaintiff reported "complete decreased sensitivity and burning sensation of the middle and ring fingers corresponding to the common digital nerve branch of the median nerve." (Tr. 200). Plaintiff was unable to fully extend his middle and ring fingers and the doctor observed a flexion contracture at the PIP joint. (Tr. 200). Plaintiff's right hand was "cool with an increased sweat pattern." (Tr. 200). Tinel's test was positive in the mid-palmar region. (Tr. 200). The doctor observed no evidence of muscle atrophy or weakness, but noted that Plaintiff's right hand "demonstrates an appearance of avoiding use." (Tr. 200).

The doctor noted that Plaintiff underwent surgical decompression of the median nerve of the right wrist in 2005, but that during the course of this procedure "the common digital branch to the right middle and ring fingers was injured." (Tr. 200). Dr. DeHaan concluded that "[a]s a result of this nerve injury, [Plaintiff] is disabled with regards to the use of his right hand." (Tr. 201). Specifically, the doctor reported that Plaintiff cannot perform: (1) any forceful repetitive gripping, (2) production work, (3) work involving vibration or power tools, (4) work that places pressure within the palm, or (5) any type of heavy lifting or gripping. (Tr. 201).

---

[4] Reflex Sympathetic Dystrophy (also known as Complex Regional Pain Syndrome) is a chronic neurological syndrome characterized by severe burning pain, pathological changes in bone and skin, excessive sweating, tissue swelling, and extreme sensitivity to touch. *See* About CRPS, *available at*, http://www.rsds.org/2/what_is_rsd_crps/index.html (last visited on June 28, 2010). The "key symptom" of this disorder is "continuous, intense pain out of proportion to the severity of the injury;" moreover, there is no cure for this disorder which "gets worse rather than better over time." Complex Regional Pain Syndrome Information, *available at*, http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited on June 28, 2010).

On April 29, 2008, Plaintiff participated in a consultive examination conducted by James Lozer, Ed.D. (Tr. 161-65). Plaintiff reported that he was unable to work on a full-time basis due to "severe" right hand pain, borderline intellectual functioning, and learning disabilities. (Tr. 162). The doctor reported that Plaintiff "responded to the Pain Patient Profile in an open and honest manner." (Tr. 162). The doctor also noted that Plaintiff's somatization score "is close to average." (Tr. 162). Dr. Lozer observed that Plaintiff's responses were consistent with someone "with a clearly defined organic basis for pain." (Tr. 162). Plaintiff was diagnosed with depression and borderline intellectual functioning, with a full-scale IQ of 75. (Tr. 164). Plaintiff's GAF score was rated as 48.[5] (Tr. 165). Dr. Lozer concluded that due to his impairments, Plaintiff "would be unable to engage in any type of full-time gainful employment." (Tr. 165).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from carpel tunnel syndrome with possible reflex sympathetic dystrophy, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-16). The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. (Tr. 16-19). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

---

[5] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 48 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[6] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v.*

---

[6]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform medium[7] work subject to the following limitations: (1) he cannot climb ladders, ropes, or scaffolds; (2) he cannot crawl; (3) he can frequently perform pushing/pulling or overhead reaching with his left upper extremity; (4) he can only occasionally handle or finger items with his right hand, but he retains the ability to use his thumb and index finger; (5) he can use his right hand to assist but not to perform forceful gripping; (6) he must avoid extreme cold; (7) he cannot use vibrating tools; (8) he cannot perform calculations above a fifth grade math level; (9) he is limited to jobs with minimal required writing; and (10) he cannot perform work that requires him to meet production quotas. (Tr. 16).

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

---

[7] Medium work involves lifting up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Sue Lyon.

The vocational expert testified that there existed approximately 20,600 jobs in the lower peninsula of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 448-50). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).

I.      Plaintiff does not meet the Requirements of a Listed Impairment

Plaintiff asserts that his condition satisfies several of the impairments identified in the Listing of Impairments.

   A.    Section 12.05

Plaintiff asserts that he is entitled to disability benefits because he satisfies the requirements of section 12.05 (Mental Retardation) of the Listing of Impairments. The ALJ found that Plaintiff's impairments did not meet the requirements of this specific listing. Section 12.05 of the Listing provides, in relevant part, the following:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive

functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

   1. Marked restriction of activities of daily living; or

   2. Marked difficulties in maintaining social functioning; or

   3. Marked difficulties in maintaining concentration, persistence or pace; or

   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.05 (2008).

Specifically, Plaintiff asserts that he satisfies section 12.05(C). As noted above, testing conducted in March 1989 revealed that Plaintiff possessed a verbal IQ of 80, a performance IQ of 87, and a full-scale IQ of 82. Testing conducted in December 2001 revealed that Plaintiff possessed a verbal IQ of 76, a performance IQ of 77, and a full-scale IQ of 75. That these latter tests were not administered until after Plaintiff attained the age of 22 is of no consequence. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (in analyzing a claim under section 12.05, the court concluded that "absent evidence of sudden trauma that can cause retardation," IQ tests create a rebuttable presumption of a fairly constant IQ throughout a claimant's life). Moreover, Plaintiff suffers from a physical impairment which imposes additional and significant work-related limitations, as evidenced by the ALJ's RFC determination.

First, testing reveals that Plaintiff possesses an IQ between 75-82. Thus, Plaintiff fails to satisfy the express requirements of subsection (C) or any other subsection of Listing 12.05. Even if Plaintiff could satisfy the requirements of subsection 12.05(C), he also fails to satisfy the requirements articulated in the introductory paragraph of Section 12.05. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(A) ("[i]f your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets" section 12.05). Specifically, Plaintiff must establish that he satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. *Cooper v. Commissioner of Social Security*, 217 Fed. Appx. 450, 451 (6th Cir., Feb. 15, 2007); *see also*, *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (to satisfy Section 12.05, the claimant must demonstrate that he experienced deficiencies in adaptive functioning prior to attaining the age of 22).

The record contains no evidence that Plaintiff experienced deficiencies in adaptive behavior or suffered from mental retardation prior to the age of 22 or at anytime after age 22. Neither Plaintiff's care providers nor any of the medical professionals who examined the record in this case concluded that Plaintiff was mentally retarded or satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. Moreover, on two separate occasions an examiner with the Social Security Administration has determined that Plaintiff does not suffer from mental retardation, but instead suffers from borderline intellectual functioning. This conclusion enjoys substantial support in the record. As the Sixth Circuit has observed, a diagnosis of borderline intellectual functioning is inconsistent with a diagnosis of mental retardation and, therefore, precludes a finding that the requirements of Section 12.05 have been met. *See Cooper*, 217 Fed. Appx. at 451.

Plaintiff's behavior and activities likewise fail to support Plaintiff's argument that he satisfies Section 12.05. Plaintiff has maintained employment throughout much of his adult life and has also reported engaging in a wide range of activities inconsistent with the conclusion that he is mentally retarded. Such indicates that Plaintiff did not experience deficiencies in adaptive behavior prior to age 22, or thereafter for that matter. *See Burrell v. Comm. of Soc. Sec.*, 2000 WL 1827799 at *2 (6th Cir., Dec. 8, 2000) (no evidence of a deficit in adaptive functioning where claimant "remained fairly active, maintains an interest in his household, and enjoys apparent satisfactory relationships with family members"); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) (claimant with a 10th grade education, who worked as an oil-changer, not disabled under section 12.05); *Williams v. Sullivan*, 970 F.2d 1178, 1185 (3rd Cir. 1992) (claim of mental retardation contradicted by the fact that claimant was able to "maintain a job for most of his adult

life"); 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(D) (recognizing that when evaluating mental disorders, a claimant's work history is "particularly useful" in assessing the extent of impairment).

The Court concludes, therefore, that substantial evidence supports the ALJ's determination that Plaintiff does not satisfy this particular Listing.

B.  Section 1.02(B)

Plaintiff next asserts that he satisfies the requirements of Section 1.02B of the Listing of Impairments. This particular provision is satisfied when the claimant experiences a "major dysfunction of a joint(s)" that results "in inability to perform fine and gross movements effectively, as defined in 1.00B2c." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02 (2008). Section 1.00(B)(2)(c) provides that "[i]nability to perform fine and gross movements effectively means an extreme loss of function of *both* upper extremities." While Plaintiff arguably experiences an extreme loss of function in his right upper extremity, he suffers no such limitations with respect to his left upper extremity. Accordingly, the undersigned concludes that substantial evidence supports the ALJ's determination that Plaintiff does not satisfy this particular Listing.

C.  Section 11.08

Plaintiff also asserts that he satisfies the requirements of Section 11.08 of the Listing of Impairments. This particular Listing concerns "[s]pinal cord or nerve root lesions" which results in "[s]ignificant and persistent disorganization of motor function in two extremities." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.08 (2008). While Plaintiff arguably experiences a

disorganization of motor function in his right upper extremity, he suffers no such limitations in any of his other extremities. Accordingly, the undersigned concludes that substantial evidence supports the ALJ's determination that Plaintiff does not satisfy this particular Listing.

II.          The ALJ's Conclusion that there Exists a Significant Number of Jobs which Plaintiff can Perform Despite his Limitations is not Supported by Substantial Evidence

The ALJ found that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. The ALJ, therefore, concluded that Plaintiff was not disabled. Plaintiff asserts that this conclusion is not supported by substantial evidence. The undersigned agrees.

The ALJ found that Plaintiff retains the ability to perform medium level work subject to the limitations identified above. This conclusion is not supported by substantial evidence. The record contains no medical evidence that supports or is consistent with the ALJ's RFC determination. To the contrary, Plaintiff's care providers have concluded that Plaintiff is impaired to an extent far beyond that recognized by the ALJ. Dr. Drouillard concluded that Plaintiff suffers from complex regional pain syndrome and was only able to work "in a one-handed capacity." Dr. DeHaan concluded that Plaintiff was unable to perform any type of heavy lifting and was unable to perform work activities with his right hand. Plaintiff's reported activities, likewise, fail to support the conclusion that he can perform medium level work. As previously noted, medium work involves lifting up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. In sum, the record is devoid of evidence to support the ALJ's RFC determination.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations. However, the ALJ's RFC

17

determination is not supported by substantial evidence. Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled. The Court recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings, including but not necessarily limited to, a determination of Plaintiff's RFC and whether such precludes the performance of his past relevant work or any other work which exists in significant numbers.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: July 16, 2010         /s/ Ellen S. Carmody
                            ELLEN S. CARMODY
                            United States Magistrate Judge